**The relief described hereinbelow is SO ORDERED.**

**SIGNED this 4th day of November, 2014.**



_____
Robert D. Berger
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re:

MARK ANTHONY JAMES and
CAROLYN MARIE JAMES,                                      Case No. 12-23121
        Debtors.

**MEMORANDUM OPINION AND ORDER OVERRULING
REC AUTO CREDIT'S OBJECTION TO CONFIRMATION OF PLAN**

Comes on for hearing confirmation of Debtors' chapter 13 plan,[1] REC Auto Credit's (REC Auto) objection[2] to confirmation of Debtors' chapter 13 plan, and Debtors' reply[3] to REC Auto's objection to Debtors' proposed chapter 13 plan. The parties have agreed this matter may be submitted on the pleadings and exhibits attached thereto.

This matter constitutes a core proceeding and the Court has jurisdiction to decide the

---

[1] Doc. 2.
[2] Doc. 13.
[3] Doc. 14.

14.11.04 James Confirmation Objection Order.wpd

matter in controversy.[4] After review of Debtors' proposed chapter 13 plan ("Plan"), the objections thereto, attached exhibits, the Court's file, and consideration of counsel's arguments, the Court is ready to rule.

## **Background**

At issue is whether Debtors must cure and assume the Closed End Motor Vehicle Lease ("Contract") between REC Auto and Debtors as a lease subject to 11 U.S.C. §§ 365 and 1322(b)(7) or whether Debtors may properly treat the Contract as a security agreement for a personal use automobile.[5] For the reasons set forth below, the Court concludes that the Contract is a disguised security agreement under Kansas law and that the Plan provides for proper treatment of REC Auto's claim. The Debtors' Plan provides for payment of REC Auto's 910-day claim[6] in full with postpetition interest.

In the United States, the automobile enjoys a particularly vibrant and pervasive position in and effect on the American economy, only amplified by the relative dearth of public transportation.[7] Ninety-one percent of adults commute to work using their personal vehicles.[8]

---

[4] This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(L). This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. All future statutory references are to the Bankruptcy Code ("Code"), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532, unless otherwise specifically noted.

[5] Neither party has asserted the applicability of the Federal Consumer Leasing Act, Regulation M, the Truth-in-Lending Act and Regulation Z in their arguments. For purposes of this decision, the Court rules under pertinent Kansas state law and has determined that such resolution is not inconsistent with pertinent federal law. *See generally* CAROLYN L. CARTER, ET AL., NATIONAL LAW CONSUMER CENTER, CONSUMER CREDIT REGULATION §10.24 (2012); DIANE E. THOMPSON, ET AL., NATIONAL CONSUMER LAW CENTER, TRUTH IN LENDING § 13 (8th ed. 2012); CAROLYN L. CARTER, ET AL., NATIONAL CONSUMER LAW CENTER, REPOSSESSIONS § 14.2.3 (8th ed. 2013).

[6] A 910-day claim (or 910 claim) is an automotive loan made within 910 days of filing a petition for bankruptcy as set forth in the hanging paragraph of § 1325.

[7] DEP'T OF THE TREASURY & COUNCIL OF ECON. ADVISORS, A NEW ECONOMIC ANALYSIS OF INFRASTRUCTURE INVESTMENT 3 (2012) (noting that the average American family spends almost $7,600 a year on transportation-related expenses due in large part to a lack of alternatives to automobile traffic).

[8] NATIONAL CONSUMER LAW CENTER, CONSUMER CREDIT REGULATION §10.3.1.1 at 447 n.53, citing U.S. Department of Transportation, Bureau of Transportation Statistics, NHTS 2001 Highlights Report, BTS03-05 (Washington, D.C. 2003).

An automobile is virtually essential for a worker to engage in productive and beneficial employment which, in turn, improves the chances a debtor will complete his or her chapter 13 plan.

The policy goals of achieving a successful chapter 13 plan are strained when a debtor's financial condition precludes using or owning a vehicle. A household with an annual income less than $25,000 is nine times more likely to be without an automobile than those households with annual incomes in excess of $25,000.[9] Low income families have difficulty procuring a reliable automobile due to their economic situation. In turn, the inability to procure a reliable automobile materially affects the family's economic success.[10] Breaking this cycle is difficult, but of the low income families who are able to gain access to a reliable vehicle, it has been observed that within "[o]ne year after receiving a vehicle, 70% of the families went off public assistance, 80% were working, and 13% were in job training."[11] The automotive industry and its many appendages are not only a cornerstone of our economy, but also affect the economic viability and opportunities of the American worker and the safety of American citizens.[12]

## Discussion

Debtors filed their chapter 13 petition and Plan on November 16, 2012. Debtors' Plan lists an automobile and an associated debt owed to REC Auto.[13] REC Auto objects to confirmation of Debtors' Plan and alleges Debtors wrongfully describe REC Auto as a 910-day

---

[9] *Id.* § 10.3.1.1 at 447.
[10] *Id.*
[11] *Id.* at n.55.
[12] Alan Berube, et al., *Socioeconomic Differences in Household Automobile Ownership Rates: Implications for Evacuation Policy* 2-3, UNIV. OF CAL. TRANSP. CTR., WORKING PAPER NO. 804 (June 2006), http://socrates.berkeley.edu/~raphael/BerubeDeakenRaphael.pdf (noting that citizens of New Orleans who lacked access to an automobile were less able to escape the ravages of Hurricane Katrina in 2005).
[13] Doc. 2 (erroneously listed in the Debtors' Plan as "RC Auto").

car loan creditor. REC Auto argues its position by referring to the Contract which it contends does not involve a lending relationship, but rather a leasing agreement in which REC Auto leased a 2004 Pontiac Grand Prix ("Vehicle") to the Debtors as lessees.[14]

Under the Contract, Debtors are required to make weekly lease payments of $100. Debtors' Plan proposes payment of $396 per month for no less than 36 months. Debtors' proposed Plan payment is insufficient if the Contract were an executory contract under §§ 1322(b)(7) and 365(a).[15] If the Contract were a lease, Debtors could retain the use of the Vehicle only if all monetary defaults were cured and the Court approves assumption of the Contract.[16] The Debtors have not complied with these requirements.[17] REC Auto also contends that should the Contract be treated as a 910-day car loan, Debtors are not entitled to "cram down" the secured claim to the collateral's value under § 1325 because the Contract was entered into less than 910 days prior to the filing of the bankruptcy petition.[18]

Debtors assert their characterization of the Contract as a 910 claim is correct because the Contract is a disguised security interest and purchase-money sale agreement rather than a true lease under K.S.A. § 84-1-203(a).[19] Debtors also support their position by citing various Contract provisions. For example, Debtors allege the early termination provisions assure that REC Auto receives the total Contract price which has the effect of precluding early

---

[14] REC Auto's obj. to Plan confirmation, Doc. 13 ¶ 2 at 1.
[15] *Id.* ¶ 3–4 at 1–2.
[16] See generally § 365.
[17] Doc. 13 ¶ 5 at 2.
[18] *Id.* ¶ 6 at 2. This objection is without merit because by their very nature, 910-day car loans may not be crammed down to the value of the collateral, and the Debtors' Plan does not seek to cram down. REC Auto will also receive interest on the entire claim. *In re Jones*, 530 F.3d 1284 (10th Cir. 2008). To pay REC Auto's claim in full with interest, Debtors' Plan will extend beyond 36 months. The Debtors' Plan complies with the § 1325(a) hanging paragraph.
[19] Debtors' Reply to REC Auto's obj. to Plan confirmation, Doc. 14 ¶ 2 at 1.

- 4 -

14.11.04 James Confirmation Objection Order.wpd

Case 12-23121   Doc# 50   Filed 11/04/14   Page 4 of 13

termination.[20]  REC Auto may compel compliance with the Contract because it is allowed to disable the Vehicle through a remotely controlled payment guarantee device if any payment is not timely made.[21]  Additionally, Debtors allege the purchase option clause at the end of the term under the Contract equals or exceeds the economic life of the goods for the purpose of K.S.A. § 84-1-203(b)(1).[22]  Finally, Debtors allege the ancillary obligations in the Contract reinforce that the Contract as a whole represents a disguised security agreement.[23]

The Bankruptcy Code generally leaves intact the determination of property rights under state law.[24]  Even so, an agreement calling for a series of payments for the transfer and use of property may either be described as an installment sale or as a lease transaction.[25]  In Kansas, if the transfer is a sale, then ownership of the property transfers to the transferee subject to the transferor's security interest.[26]  The transferor's security interest is defined as an interest in personal property or fixtures which secures payment or performance of an obligation.[27]  However, if the transfer is a lease, then the transferor retains legal ownership of the property.[28]  A lease is defined as a transfer of the right to possession and use of goods for a term in return for

---

[20] *Id.* ¶ 6–8 at 2–3.
[21] *Id.* ¶ 9 at 3.  Of course, doing so postpetition while the automatic stay is in effect would violate § 362(a).
[22] *Id.* ¶ 11 at 3–4.
[23] *Id.* ¶ 13 at 4.
[24] *Butner v. United States*, 440 U.S. 48, 54–55 (1979) (noting that the existence, nature, and extent of a security interest is governed by state law).  An exception exists when the application of state law would contravene the purposes and objectives of the Bankruptcy Code.  *See, e.g., In re KAR Dev. Assoc., L.P.*, 180 B.R. 629, 637 (D. Kan. 1995) (affirming a Kansas bankruptcy court's decision to apply an economic realities test to determine whether a real estate transaction should be characterized as a lease despite Kansas case law to the contrary).
[25] Shu-Yi Oei, *Context Matters: The Recharacterization of Leases in Bankruptcy and Tax Law*, 82 AM. BANKR. L.J. 635, 639–42 (2008) (noting the similarities in form between sale and lease transactions).
[26] K.S.A. § 84-1-201(b)(35) (stating that the retention of title by a seller of goods notwithstanding delivery to the buyer is limited in effect to a reservation of a security interest).  *See also* K.S.A. § 84-2-401(2) (stating that title in personal property passes to the buyer when the seller completes delivery of the goods).
[27] K.S.A. § 4-1-201(b)(35).
[28] K.S.A. § 84-2a-302.

- 5 -
14.11.04 James Confirmation Objection Order.wpd

consideration.[29]

While the definitions and characteristics of the above-described transactions appear straight-forward, the issue of categorizing a specific transaction as either a lease or a security agreement is a problem that "has vexed the courts for many years."[30] A document denominated as a lease may be construed to create a security interest if the terms and contents thereof are more consistent with a security interest than a lease.[31] While the law does not draw an absolute line between a security interest and a lease, this determination should be made on the factual basis that the transaction is more similar to one or the other. In making this determination, early courts focused on the parties' actual intent and applied a multi-factor test to the transaction.[32] This approach, however, proved largely unworkable because often a single factor was just as applicable to a true lease as it was to a true security interest.[33] The multi-factor test was subsequently abandoned in favor of a two-prong test that examines the underlying economic realities of the transaction rather than the parties' subjective intent.[34]

The two-prong test to establish whether a transaction in the form of a lease creates a lease or a security interest is codified in K.S.A. § 84-1-203(b). Both prongs must be proven to establish a security interest. This determination is made by the facts of each case. The first prong establishes a security interest if the consideration paid by the lessee for the right to

---

[29] K.S.A. § 84-2a-103(1)(j).
[30] *Charles v. U.S. Bancorp Leasing & Financial (In re Charles)*, 278 B.R. 216, 221 (Bankr. D. Kan. 2002).
[31] *Exec. Fin. Servs., Inc. v. Pagel*, 238 Kan. 809, 812 (Kan. 1986).
[32] *See, e.g.*, *Atlas Indus., Inc. v. Nat'l Cash Register Co.*, 216 Kan. 213 (1975) (applying a 12-factor test to determine whether a transaction constituted a lease or a security agreement).
[33] U.C.C. § 1-201(37) cmt. ¶ 37 (2001) (noting that criteria thought to be consistent with either sales or loans in fact were applicable to both sales and loans).
[34] This test was initially included in the definition of the term "security interest" codified in K.S.A. § 84-1-201(37) (2001). Later, consistent with the U.C.C., the test was given its own heading and moved to new K.S.A. § 84-1-203. The U.C.C. Comment to § 84-1-203 notes that the substance of the test remains the same.

- 6 -

possession and use of the goods is an obligation for the term of the lease that is not subject to termination by the lessee.[35] Under the second prong, one of the following four elements must be present to establish a security interest:

(1) The original term of the lease is equal to or greater than the remaining economic life of the goods;

(2) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(3) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

(4) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.[36]

K.S.A. § 84-1-203(c)(1) also states that a transaction in the form of a lease is not a sale merely because the present value of the consideration paid by a lessee is equal to or greater than the fair market value of the goods. Also, the transaction is not necessarily a sale if the lessee has an option to purchase the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the item at the time of the option's exercise.[37] Here, Debtors carry the ultimate burden of persuasion since they are seeking to recharacterize the Contract as a

---

[35] K.S.A. § 84-1-203(b).
[36] *Id.*
[37] K.S.A. § 84-1-203(c)(6).
- 7 -

14.11.04 James Confirmation Objection Order.wpd

disguised security interest.[38]

The Court's analysis begins by first noting that "a true lease in its purest form has two distinguishing attributes: the lessor retains an 'entrepreneurial stake' in the leased property and keeps a valuable 'reversionary' interest."[39] Specifically, the parties to the lease expect the goods to retain significant residual value after the lease term is completed and the lessor retains some possibility of gain or risk of loss in the value of the goods.[40] With this framework in mind, the Court now examines the composition of the lessee's payments and the termination provisions to determine whether the Contract satisfies the first prong of K.S.A. § 84-1-203(b).

Under the terms of the Contract, Debtors' payments total $15,850 and consist of the amount due at lease signing ($250) plus the sum of the periodic payments ($15,600).[41] Each periodic payment is $100 and is paid weekly for 156 weeks.[42] The sum of the periodic payments reflects the $9,450 agreed upon value of the Vehicle, a $4,805.42 rent charge, and other miscellaneous expenses (including sales tax) for a total base amount of $14,322.36. The Vehicle's estimated end-of-contract residual value of $962.27 and $220.79 of the $250 paid at the lease signing are excluded from the total base amount.[43]

For an early termination of the Contract, Debtors are liable to pay REC Auto the total of any unpaid monthly payments due under the Contract, an early termination fee of $500, and the

---

[38] *Hitchin Post Steak Co. v. Gen. Elec. Capital Corp. (In re HP Distribution LLP)*, 436 B.R. 679, 681–82 (Bankr. D. Kan. 2010).
[39] *Id*. at 684 (citing James White and Robert Summers, 4 UNIFORM COMMERCIAL CODE § 30-3 at 2 (2009)).
[40] *Id*.
[41] Ex. A of REC Auto's obj. to Plan confirm., Doc. 13-1 § 2 at 1.
[42] *Id*. § 3 at 1.
[43] *Id*.

amount of the adjusted lease balance that exceeds the Vehicle's realized value[44] at termination.[45] However, if the remaining monthly Contract payments are less than the amount calculated under the early termination formula, then Debtors are only required to pay the weekly payments remaining under the Contract.[46] Debtors' liability to make the remaining Contract payments is not terminable.[47] Debtors remain liable for the full Contract amount even upon early termination of the Contract. In reality, the right to terminate by the Debtors is a fiction. Debtors' inability to extricate themselves from the financial obligations of this Contract precludes a right to terminate the obligation for Contract payments, even though the terms of the Contract provide for early termination.[48] The first prong of the test is satisfied because the Debtors' obligation to pay consideration under the Contract for the right to possession and use of the Vehicle is an obligation for the term of the Contract that may not be terminated by the Debtors.

Debtors need only satisfy one of the four elements under K.S.A. § 84-1-203(b)(1)–(4) to satisfy the second prong of the test. The first three elements require an examination of the Vehicle's economic life in relationship to the lease term, and since neither party provided any evidence to support their position on this issue, the first three elements are disregarded except as touched upon in the Court's analysis below. This leaves only the last element. Under K.S.A. § 84-1-203(b)(4), an agreement will satisfy the second prong if the lessee has an option to

---

[44] "The Vehicle's realized value is: the price we [REC Auto] receive for the Vehicle at disposition; the highest offer we receive for disposition of the Vehicle; or the fair market value of the Vehicle at the end of the Lease term. We will add to the amount you owe us what it costs us to pay someone to dispose of the Vehicle (for example, an auction fee)." Doc. 18-1 ¶ 14 at 1.

[45] Debtors' Reply to REC Auto Credit's obj. to Plan confirm., Doc. 14 ¶ 6–8 at 2–3.

[46] *Id*.

[47] CAROLYN L. CARTER, ET AL., NATIONAL CONSUMER LAW CENTER, REPOSSESSIONS § 14.1.2.3.2 at 494-95 (8th ed. 2013), collecting cases at n.14.

[48] *Morris v. Dealers Leasing, Inc. (In re Beckham)*, 275 B.R. 598, 602 (Bankr. D. Kan. 2002) (conceding that there is authority to assert that the first prong is satisfied when the financial obligation of the debtor is non-cancelable, although ultimately deciding the case on other grounds).

become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised.[49] Stated differently, the lessee must compare the cost not to exercise a purchase option to the cost to exercise a purchase option. When a lessee does not exercise a purchase option, the lessee loses the use of the leased asset and must calculate the cost of acquiring a replacement asset. If it is cheaper for the lessee to exercise the purchase option over the leased asset rather than to replace the asset, then the option's consideration may be nominal. However, if at the time the option is granted, the exercise price is stated as the asset's fair market value determined at the time of exercise, then the consideration is *not* nominal.[50] Intuitively, there would not be a monetary incentive for the lessee to exercise a purchase option when the cost of exercise is equal to the asset's fair market value; thus, an option's consideration would not be nominal.

The Contract states that Debtors have the option to purchase the Vehicle at the end of the lease term for the Vehicle's "FMV."[51] Debtors' reasonably predictable cost of exercising the Purchase Option at End of Lease Term is equal to the Vehicle's fair market value. According to K.S.A. § 84-1-203(d)(2), the payment of the Vehicle's fair market value in exercise of this option is *not* nominal; thus the second prong of the test is not satisfied under this Contract provision.

However, Debtors possess a second purchase option under the Contract. In addition to

---

[49] K.S.A. § 84-1-203(d).
[50] K.S.A. § 84-1-203(d)(2).
[51] Ex. A of REC Auto's obj. to Plan confirm., Doc. 13-1 § 3 at 1. This Court interprets the term "FMV" as shorthand for fair market value.

the Purchase Option at End of Lease Term, Debtors may exercise a purchase option upon early termination by paying the balance of the unpaid Contract payments at the time of early termination.[52] Debtors will also be liable for the early termination penalty, but the penalty's formula is capped at the amount remaining under the Contract.[53]

"Several courts have held that an arrangement which predictably gives the lessee no rational economic alternative but to purchase the goods at lease end does not constitute the payment of additional consideration or is nominal consideration and is therefore a security agreement rather than a lease."[54] The Debtors are faced with three alternatives near the end of the Contract's term: surrender the Vehicle and lose the future value of the Vehicle's use; complete the Contract's term and exercise the Purchase Option Upon Completion by paying the Vehicle's fair market value; or terminate the Contract early and exercise the Early Termination Purchase Option by paying an amount equal to the remaining adjusted lease balance plus a nominal early termination penalty.

The Official Comment to the Uniform Commercial Code emphasizes that the focus of the analysis should be on the underlying economics of the transaction.[55] A rational lessee would exercise the Early Termination Purchase Option when the sum of the early termination penalty and the amount due under the adjusted lease balance is less than the Vehicle's fair market value

---

[52] Ex. A to Debtors' Amended Reply to REC Auto Credit's obj. to Plan confirm., Doc. 18-1 §15 at 2 (hereinafter, "Early Termination Purchase Option"). DIANE E. THOMPSON, ET AL., NATIONAL CONSUMER LAW CENTER, TRUTH IN LENDING § 13.2.3 at 931 (8th ed. 2012).

[53] Ex. A to Debtors' Amended Reply to REC Auto Credit's obj. to Plan confirm., Doc. 18-1 §14 at 1.

[54] *Beckham*, 275 B.R. at 603 (parenthetical phrase omitted) (citing *In re Taylor*, 209 B.R. 482, 486 (Bankr. S.D. Ill. 1997) for its "No Lessee in its Right Mind test," where a purchase option is considered nominal if "only a fool would fail to exercise the option"). *See also* NATIONAL CONSUMER LAW CENTER, TRUTH IN LENDING § 13.2.3 at 931; NATIONAL CONSUMER LAW CENTER, REPOSSESSIONS § 14.1.2.3.2 at 494-95.

[55] U.C.C. § 1-201(37) cmt. ¶ 37 (2001) (noting that all four tests under the second prong focus on economics).

at the end of the Contract's term. The combined sum of the early termination fee and the amount owed under the adjusted lease balance could be as little as $200 if Debtors terminate the Contract immediately prior to making the last scheduled installment payment. At such termination, the Vehicle's fair market value will be uncertain, but it will largely be determined by the Vehicle's mileage and condition. The Contract specifies that the lessee will be charged for "excessive wear and use" and sets the normal standard for usage at 15,000 miles annually.[56] The Vehicle can be expected to have around 169,688 miles at the early termination date if the estimated usage is extrapolated over the Contract term.[57] There is sufficient evidence in the record to indicate that the reasonably predictable cost of exercising the Early Termination Purchase Option is nominal in comparison to the Vehicle's fair market value on the date of early termination.[58] Thus, with respect to this second purchase option, the second prong set out in K.S.A. § 84-1-203(b)(4) is satisfied and the Contract is properly characterized as a disguised secured transaction.

## Conclusion

REC Auto possesses substantial bargaining power when it writes the terms of its adhesion agreements with low income consumers who are trying to secure access to reliable transportation. Frequently, the financial paradox is that those with the least pay the most for the

---

[56] Ex. A of REC Auto's Obj. to Plan confirm., Doc. 13-1 § 3 at 1 (titled "Excessive Wear and Use").

[57] The Vehicle's odometer read 124,688 at the time the Contract was signed which, when added to the 15,000 annual usage over the three-year Contract term, could reasonably be 169,688.

[58] *See, e.g., Morris v. Dealers Leasing, Inc. (In re Beckham)*, 275 B.R. 598, 605–06 (Bankr. D. Kan. 2002) (reaching an opposite conclusion after finding that "[t]here is no evidence that the 'lease end residual value' was set at a price less than the anticipated fair market value of the vehicles").

14.11.04 James Confirmation Objection Order.wpd

least.[59]  Admittedly, many of REC Auto's customers may pose a high credit risk[60] and may otherwise be unable to secure credit to purchase a vehicle elsewhere.  In drafting these agreements, REC Auto may intend that the form of its standard Contract provide for some flexibility in characterizing the transaction as one giving rise to either a security interest or a lease, but the economic substance of the transaction here remains a sale.  REC Auto's objection to confirmation is overruled.  A separate order confirming the Plan will issue.

     IT IS SO ORDERED.

###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS

---

[59] *See* Chico Harlan, *Rental America: Why the poor pay $4,150 for a $1,500 sofa,* WASHINGTON POST (Oct. 6, 2014), http://www.washingtonpost.com/news/storyline/wp/2014/10/16/she-bought-a-sofa-on-installment-payments-now-its-straining-her-life/.

[60] *See* AnnaMarie Andriotis, *Bank Regulator Warns of Lax Standards on Auto Loans*, WALL STREET JOURNAL (Oct. 28, 2014), http://blogs.wsj.com/totalreturn/2014/10/28/bank-regulator-warns-of-lax-standards-on-auto-loans/?KEYWORDS=bank+regulator+warns; Sarah Mulholland and Matt Robinson, *Subprime Auto Loan Probe Widens as GM Discloses Subpoenas*, BLOOMBERG (Oct.24,2014),http://www.bloomberg.com/news/2014-10-24/subprime-auto-loan-probe-widens-as-gm-discloses-subpoenas.html. Perhaps these circumstances are exacerbated by inflated prices, high interest rates and remote starter interrupt devices that allow lenders to disable a car's starter when a payment is late. *See* Michael Corkery and Jessica Silver-Greenberg, *Miss a Payment? Good Luck Moving that Car*, N.Y. TIMES (Sept. 24, 2014), http://dealbook.nytimes.com/2014/09/24/miss-a-payment-good-luck-moving-that-car/ (a print version appears in the Sept. 25, 2014, edition of N.Y. Times at A1).

14.11.04 James Confirmation Objection Order.wpd